**ALLENDALE MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**EXCESS INSURANCE COMPANY LTD., et al., Defendants.**

**No. 95 CIV. 10970(SAS).**

United States District Court, S.D. New York.

Aug. 12, 1999.

Bernard London, James L. Fischer, James Walsh, London Fischer, Daniel P. Levitt, New York City, for Plaintiff.

Neal M. Glazer, Jan H. Duffalo, D'Amato & Lynch, New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This case presents the Court with the unfortunate dilemma of either dismissing an action for want of jurisdiction after more than three years of litigation including a trial or reconfiguring the case to create diversity jurisdiction where none exists. Because such reconfiguration would strain the Supreme Court's guidelines on diversity jurisdiction, the former

course is more prudent. In addition, any efficiencies that might be gained by continuing this litigation in federal court would be squandered if the parties are forced to begin again in state court after appellate review of the jurisdictional issue.

## I. BACKGROUND

### A. Procedural History

Plaintiff Allendale Mutual Insurance Company ("Allendale") filed a Complaint on December 28, 1995 alleging that defendants Excess Insurance Company, et al. ("Reinsurers")[1] breached the parties' insurance agreement (the "contract"), in three ways: (1) by wrongfully refusing to pay a $7 million claim; (2) by failing to investigate that claim in good faith; and (3) by initiating suit on the contract in England in spite of the contract's forum-selection clause which requires that litigation arising from the contract be brought in New York. Defendant Reinsurers are sixteen London Market Companies and thirty-six Lloyd's of London syndicates comprised of thousands of individual underwriters.[2] After a seven-day bench trial held in December 1997, this Court ruled that defendants were entitled to a rescission of the contract. As a result, defendants could not have breached and did not breach that contract when they refused to pay plaintiff's claim. I further found that defendants did not breach the contract's implied covenant of good faith and fair dealing. I did find, however, that the Reinsurers had breached the contract's forum selection clause by bringing suit in England. Consequently, Allendale was entitled to recover $62,273.15 in costs related to the English action.[3] See Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd., 992 F.Supp. 278, 286 (S.D.N.Y.1998).

Allendale appealed, and Reinsurers cross-appealed. On March 2, 1999, the Second Circuit vacated and remanded, directing this Court "to determine if subject matter jurisdiction over this case may be preserved in light of" E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co., 160 F.3d 925 (2d Cir.1998)("Squibb I "). Allendale Mut. Ins. Co. v. Excess Ins. Co., Summary Order, No. 98–7521, No. 98–7599 (2d Cir. March 2, 1999). Needless to say, the appellate court did not reach the merits of the dispute.

### B. The Squibb Case

In Squibb I, a case involving Lloyd's Underwriters at Lloyd's of London, the Court of Appeals examined whether subject matter jurisdiction was appropriate given the citizenship of the parties and remanded the case to the district court for further inquiry. In addressing the unique issue of the citizenship of the London insurance market defendants, the Second Circuit followed the Seventh Circuit by holding that each and every Name underwriter must meet the complete diversity rule.[4] See Indiana Gas Co. v. Home Ins. Co., 141 F.3d 314 (7th Cir.1998); but see Certain Interested Underwriters at Lloyd's, London v. Layne, 26 F.3d 39 (6th Cir.1994)(holding that lead underwriter is only real party in interest to controversy

---

1. The defendant Reinsurers are those certain Underwriters at Lloyd's, London and insurance companies operating in the London Market which subscribed to Cover Note MY602091.

2. A "syndicate" is the collective term for a group of Names whose underwriting has been delegated to the same managing agent for that year.

3. For a full procedural and factual history of this litigation, see Allendale Mut. Ins. Co. v. Excess Ins. Co., 970 F.Supp. 265 (S.D.N.Y.),

modified following motion for reargument, 992 F.Supp. 271 (S.D.N.Y.1997).

4. In so doing, the Second Circuit also followed the reasoning of the Supreme Court in United Steelworkers of America v. R. H. Bouligny, Inc., 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965)(holding that citizenship of unincorporated associations like labor unions turns on that of individual members, rather than entity itself), and Carden v. Arkoma Assoc., 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990)(Bouligny approach extended to limited partnerships).

and hence it is only Lloyd's Name that must be completely diverse). The Second Circuit concluded:

> We hold that when a *Lloyd's lead underwriter* is sued in a *representative capacity* (but not in a class action) each and every Name whom the lead underwriter represents must be completely diverse. But we also hold that when a *Lloyd's Name* (including a lead underwriter) is properly sued *only in an individual capacity,* it is that Name's characteristics, both as to citizenship and jurisdictional amount, that are determinative for jurisdictional purposes. And the fact that other Lloyd's underwriters who are not diverse parties in the suit may be bound by the result of the suit (whether by contract or by preclusion) is of no consequence.

*Squibb I,* 160 F.3d at 939–40 (emphasis added).

On remand, the district court conducted a hearing to resolve the factual questions raised by the appellate court regarding the citizenship of the parties and the amount in controversy. After hearing from experts in the London insurance market and plaintiff and defense counsel who both, after sixteen years of litigation, vehemently supported the exercise of jurisdiction, Judge John Martin found that the parties satisfied the requirements of diversity jurisdiction. *See E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.,* 82 Civ. 7327, 1999 WL 350857, at *17 (S.D.N.Y. June 2, 1999)("*Squibb II* ").

Squibb, a citizen of Delaware and New Jersey, sued defendant Allen Haycock, a British subject, in his *individual capacity and as a representative underwriter.* The parties stipulated a decade before trial that Haycock would act as a representative for all the underwriters. After finding the citizenship of Squibb and Haycock to be diverse, Judge Martin found no reason to inquire whether the amount in controversy requirement had been met "since there has never been any suggestion in this case that the plaintiff did not act in good faith when it made the factual allegations that the amount in controversy exceeded $10,-000 and there is no evidence of any collusion between the parties when the allegation was made." *Squibb II,* 1999 WL 350857, at *7. Judge Martin acknowledged the absurdity of dismissing a case that had consumed sixteen years of federal judicial effort based on the jurisdictional amount rule which serves to ensure that the federal court's time is not spent on trivial matters. *See id.* at *10 (citing *Hatridge v. Aetna Cas. & Sur. Co.,* 415 F.2d 809, 815 (8th Cir.1969) (citing C. Wright, *Federal Courts* § 34 (1964))).

Judge Martin found subject matter jurisdiction even if the amount in controversy was not satisfied because the claim against a foreign party need not satisfy the jurisdictional requirement if that claim is joined to a controversy between citizens of different states that satisfies the "amount in controversy" requirement. *Id.* at *9–10.[5] Finally, the court determined that the claim against Merrett, another Name underwriter sued in his individual capacity,

---

**5.** Section 1332 provides:
 (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between -
 (1) citizens of different States;
 (2) citizens of a State and citizens or subjects of a foreign state;
 (3) citizens of different states and in which citizens or subjects of a foreign state are additional parties.
42 U.S.C. § 1332(a). The Second Circuit expressed its skepticism concerning the argu-

ment that § 1332(a)(3) does not require claims against foreign parties to meet the jurisdictional amount. *See Squibb I,* 160 F.3d at 934. Nevertheless, Judge Martin determined that the claims against the foreign defendants need not meet the amount in controversy test. *See Squibb II,* 1999 WL 350857, at *9. Judge Martin went further, determining that even if § 1332(a)(3) did not provide an exception to the amount in controversy requirement for claims against foreign defendants, the jurisdictional amount was actually satisfied. *See id.* at *8.

met the diversity jurisdiction requirements including the amount in controversy.

After determining that jurisdiction existed over Haycock and Merrett in their *individual* capacities, Judge Martin addressed the suit against them in their *representative* capacities. *Id.* at *11. Judge Martin ruled that the Lloyd's member underwriters, other than Haycock and Merrett, were not "indispensable parties" because they had agreed to be bound by a judgment against named defendant Haycock or Merrett in their representative capacities. The court noted that "it is hard to imagine a case in which 'equity and good conscience' so strongly indicate that the case should be allowed to proceed in the absence of other potential defendants." *Id.* at *11 (quoting Fed.R.Civ.P. 19(b)). He therefore permitted the suit to continue against Haycock and Merrett in their representative capacities.

Judge Martin provided an alternative ground for federal jurisdiction by recasting the action as a Rule 23 class action. In such actions, the citizenship of the class representative alone is considered in determining diversity. Accordingly, it would not defeat diversity if any of the Names were citizens of plaintiff's state. In addition, Judge Martin reasoned that despite the Supreme Court's ruling in *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), that a class action may not proceed on behalf of or against a party whose claim does not satisfy the jurisdictional amount, the thousands of Names who may be liable to Squibb are citizens of foreign states who need not satisfy the jurisdictional amount. *Id.* at *14–15; *see supra* note ——. In addition, Judge Martin found that the class of Names met the specific requirements for certification under Rule 23(b)(2), *i.e.*, numerosity, commonality, typicality, fairness and adequacy of the class representative, superiority of the class action device,

manageability, and notice; but that the class did not meet the requirements for a Rule 23(b)(3) action. *Id.* at *15–17.

### C. Remand of the Instant Action

On remand here, plaintiff Allendale, evidently disappointed with the trial verdict, moves to dismiss for want of jurisdiction. Defendant Reinsurers object to dismissal and suggest several ways to reconfigure the case to achieve diversity.

## II. Discussion

### A. Legal Principles Governing Federal Subject Matter Jurisdiction

Article III, § 2 of the Constitution provides: "The judicial Power shall extend ... to Controversies ... between Citizens of different States...." Congress implemented this grant in 28 U.S.C. § 1332 conferring diversity jurisdiction in the district courts when a citizen of one state sues both aliens and citizens of a different state. Diversity jurisdiction rests not only upon diversity of citizenship, but also upon plaintiff's ability to meet the required amount in controversy—$50,000.[6] "Subject matter jurisdiction is an unwaivable *sine qua non* for the exercise of federal judicial power." *Squibb I*, 160 F.3d at 929 (quoting *Curley v. Brignoli*, 915 F.2d 81, 83 (2d Cir.1990)). Its absence may be raised at any time, by the court or by any party, even a party who previously argued in favor of the exercise of jurisdiction. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *American Fire & Cas. Co. v. Finn*, 341 U.S. 6, 10, 71 S.Ct. 534, 95 L.Ed. 702 (1951). Where jurisdiction is absent, the parties cannot confer it by agreement among themselves. *See Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986).

**6.** This case was filed in 1995, after Congress increased the requisite amount to $50,000, Pub.L. No. 100–702, Tit. 11 § 201(a), 102 Stat. 4646 (1988), but before the amount was raised to $75,000, Pub.L. No. 104–317, Tit. 11, § 205(a), 110 Stat. 3850 (1996).

Nevertheless, the Supreme Court has encouraged courts to preserve diversity jurisdiction, if possible. "Once a diversity case has been tried in federal court, with rules of decision supplied by state law under the regime of [*Erie* ], considerations of finality, efficiency, and economy become overwhelming." *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 75, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996) (district court's error in failing to remand a case improperly removed is not fatal to ensuing adjudication if federal jurisdictional requirements are met at time judgment entered). "[R]equiring dismissal after years of litigation would impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention." *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 836, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989)(holding that courts of appeals had power to dismiss dispensable non-diverse parties to preserve jurisdiction); *see also Penteco Corp. Ltd. v. Union Gas Sys.,* 929 F.2d 1519, 1523 (10th Cir.1991)(after final judgment in district court despite unnoticed jurisdictional defect "the interests of justice, fairness and judicial economy require some additional opportunity to 'cure' " pleading defects).

## B. The Court Lacks Subject Matter Jurisdiction Over the Case As It Is Currently Configured

■ Allendale, proceeding on the erroneous assumption that the Lloyd's syndicates were legal entities with the capacity to be sued, named thirty-six Lloyd's syndicates as defendants, rather than naming the individual underwriters. Nineteen of the thirty-six syndicates include individual underwriters who currently reside in plaintiff's state of Rhode Island, thereby destroying diversity of citizenship.[7]

In addition, it is unlikely that *any* of the underwriters in the thirty-six syndicates can satisfy the $50,000 amount in controversy. The non-Lloyd's defendants, the London Market Companies, the vast majority of whom are British subjects, together account for slightly over 50% of the $12 million claim ($7 million of reinsurance liability plus defendants' 'proportion of any expenses incurred' claim of $5 million). The thirty-six syndicate defendants are potentially liable for 49.26% of the $12 million claim.

The smallest syndicate defendant, No. 936, assumed only .25% of the $12 million liability—a total of approximately $30,000. Accordingly, even if syndicate No. 936 has only a single underwriter, that individual could not satisfy the $50,000 amount in controversy requirement. The second smallest syndicate, No. 79, assumed only .49% of the $12 million liability—a total of approximately $58,800. Thus, assuming that syndicate 79 has more than one underwriter, no individuals within that syndicate could meet the $50,000 test.[8] Seventeen other syndicates each assumed less than 1% of the aggregate exposure, or a total of less than $120,000 each. All of these syndicates would fail the $50,000 test if they are comprised of more than two underwriters. Although syndicates typically include hundreds or thousands of underwriters, defendants have not provided any information regarding the number of individual underwriters per syndicate. Nevertheless, defendants have not asserted that any one of the thousands of underwriters in the thirty-six Lloyd's syndicates

---

7. During a Court conference on March 17, 1999, the parties agreed for purposes of this motion that: (1) one or more of the defendants was a citizen of Rhode Island and therefore a co-citizen of Allendale; and (2) individual investors in one or more of the syndicates could not possibly meet the $50,000 test. Subsequently, discovery conducted by defendants, albeit incomplete, has revealed that, in fact, the parties' assumptions regarding diversity and the amount in controversy were correct.

8. These calculations assume that all underwriters within each syndicate share liability equally. Defendants have not yet provided information from which to determine how liability is actually apportioned among the various underwriters.

is potentially liable for more than $50,000. From the information presented to date, I conclude that this Court lacks subject matter jurisdiction over this case as it now stands.

### C. Defendants' Proposed Devices to Create Subject Matter Jurisdiction

■ The party seeking to invoke jurisdiction under § 1332 bears the burden of proving complete diversity and the jurisdictional amount in controversy. *See* James Wm. Moore, 15 *Moore's Federal Practice* (M. Bender 1999) §§ 102.14, 102.107. Defendant Reinsurers argue that the Court should attempt to salvage jurisdiction over this case in the interests of judicial finality, efficiency and economy. At the very least, defendants recommend that this Court retain jurisdiction over the London Market Companies which are diverse (with one exception) and meet the requisite amount in controversy. Defendants make three distinct proposals, all of which would result in diversity of citizenship between plaintiff and defendants. Plaintiff vehemently objects to all three proposals. Rule 82 of the Federal Rules of Civil Procedure cautions that the rules of procedure "shall not be construed to extend or limit the jurisdiction of the United States district courts." Defendants' proposals appear to extend, if not contort, the jurisdictional guidelines laid down by the Supreme Court and the Court of Appeals. Accordingly, creating diversity jurisdiction in this action would not provide any advantage in terms of finality or efficiency either to the parties or to the Court.

Policy considerations militate against a finding of diversity jurisdiction. Our Court of Appeals has reminded us that "jurisdiction is not a game." *Squibb I*, 160 F.3d at 929. As the Supreme Court has made abundantly clear, "it is one of the fundamental tenets of our Constitution that only some cases may be brought in federal court." *Id.* (citing *Healy v. Ratta*, 292 U.S. 263, 270, 54 S.Ct. 700 (1934)("Due

regard for the rightful independence of state governments, which should actuate federal courts, requires that [federal courts] scrupulously confine their own jurisdiction to the precise limits which the [diversity] statute has defined.")). In addition, good judgment counsels against making "law on jurisdiction that would be undesirable in the mass of cases.... Nobody's interest would be served if ... by stretching the law [I] found jurisdiction to exist, only to have that position ultimately rejected by [the Second Circuit or] the High Court." *Squibb I*, 160 F.3d at 930. Dismissal for lack of jurisdiction is more likely to ensure that the parties do not bounce back and forth from the District Court to the Circuit Court and back again on both procedural and substantive issues. I do not dismiss this case casually, however, given the amount of time and effort already expended by the Court and the parties. I will therefore explain my reasons for rejecting each of defendants' proposals.

### 1. Option One: Dismissal, Realignment and Supplemental Jurisdiction

Defendants suggest restructuring the action by dismissing dispensable named underwriters, realigning Allendale as a defendant and exercising supplemental jurisdiction over claims which cannot meet the amount in controversy.

#### a. Dismissal of Parties

■ A court has the power to dismiss a party from a suit under Rule 21. *See* Fed.R.Civ.P. 21 ("Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just"); *Newman–Green*, 490 U.S. at 832–33, 109 S.Ct. 2218. A court may also dismiss a dispensable non-diverse party in order to salvage jurisdiction. *See* Fed. R.Civ.P. 19. However, a court must ensure that no prejudice to the remaining defendants is created by dropping a non-

diverse defendant. *See Jaser v. New York Property Ins. Underwriting Ass'n,* 815 F.2d 240, 243 (2d Cir.1987)(failure to consider whether non-diverse party was indispensable prior to dismissal constitutes abuse of discretion).

Because Allendale erroneously sued the syndicates, which are not legal entities, defendants argue that this litigation must be restructured to make one or more Names parties to the action. *See Squibb I,* 160 F.3d at 939–40. Assuming that individual Names are substituted as defendants, Reinsurers argue that those Names whose presence destroys diversity of citizenship may be dropped as dispensable parties, pursuant to Rule 19, without any prejudice to Allendale.

### i) Plaintiff Refuses to Consent to Dismissal of Non– Diverse Parties

■ Not surprisingly, Allendale refuses to consent to the dismissal of non-diverse defendants. "If a plaintiff prefers to retain a nondiverse defendant, the court will not interfere with that decision. However, the court must then dismiss the case for lack of federal jurisdiction." 15 *Moore's Federal Practice* § 102.18[1] at 102–33. The instant case is quite different from *Newman–Green,* which Reinsurers mistakenly cite for the proposition that plaintiff's consent is unnecessary to preserve jurisdiction. In *Newman–Green,* plaintiff *asked* the appellate court to dismiss a diversity-destroying defendant. *See Newman–Green,* 490 U.S. at 829, 109 S.Ct. 2218. Here, the reverse has occurred— plaintiff wants to retain a non-diverse defendant to destroy diversity. In a slightly more analogous situation before the Seventh Circuit, Judge Posner reasoned:

> If a plaintiff wants to retain a nondiverse defendant, it is no business of the court to tell him he can't; the court's job in such a case is to tell the plaintiff that he can't stay in federal court. But when a plaintiff having elected federal jurisdiction goes all through the trial and appeal of his case without breathing any

jurisdictional doubts, we think he should be deemed to have consented to the dropping of nondiverse parties if necessary to preserve federal jurisdiction. Otherwise a plaintiff who loses on the merits in the court of appeals could file a petition for rehearing pointing out the presence of the nondiverse defendant and be able to start over in state court. Of course that sort of thing can and does happen in the case of a nonwaivable limitation on federal jurisdiction, but the presence of a nonindispensable nondiverse party is an obstacle to federal jurisdiction that a plaintiff can waive, and we think he should be required to do so when his own *carelessness* about the requirements of federal jurisdiction was responsible for the case having been allowed to proceed to judgment in the district court and full briefing and argument of the merits in the court of appeals.

*Singletary v. Continental Ill. Nat'l Bank,* 9 F.3d 1236, 1238 (7th Cir.1993)(emphasis added). Allendale's predicament here, however, is somewhat different from that of plaintiff Singletary. Although Allendale erroneously sued the syndicates, believing them to be independent legal entities, there is no allegation that Allendale was careless in choosing a non-diverse defendant. Indeed, Allendale named the thirty-six Lloyd's underwriting syndicates as defendants, in the good faith belief that they were legal entities and citizens of the United Kingdom. Moreover, Allendale did not raise the issue of jurisdictional defect on appeal in order to obtain a second bite of the apple in state court. In fact, neither party here or in the *Squibb* case anticipated that the existence of a jurisdictional defect would destroy diversity. Rather, it was the Second Circuit which unexpectedly raised the jurisdictional issue in both suits after years of litigation. As far as this Court is aware, and the parties have not cited any legal precedent to the contrary, nothing in the Federal Rules permits defense counsel to substitute a defendant of

its own choosing in place of plaintiff's chosen adversary. Plaintiff should not be required to drop non-diverse defendants to maintain this action in federal court.

### ii) Are Non–Diverse Defendants Dispensable Parties?

■ Even assuming that Allendale consented to the dismissal of non-diverse defendants, the Court could not dismiss those parties if they are indispensable or if dismissal would prejudice the remaining parties. Relying on British law and customary London market practice, defendants claim that Allendale will not be prejudiced by dismissal of certain Names because a judgment against a single Name will effectively determine the obligations and liabilities of all other underwriters who subscribed to the reinsurance agreement. Moreover, the service of suit clause which is standard in Lloyd's policies provides, as a matter of contract, that each Name will abide by the outcome of any action against the single Name. *See* service of suit clause, Defendants' Memorandum in Opposition, at 5–6; [9] *Insurance Co. v. Lloyd's Syndicate* (Queen's Bench Div. Commercial Court 1995), 1 Lloyd's Rep. 272, 274, per Coleman, J. ("reinsurers agree to be bound by the decisions of the leading underwriter as to certain specified matters, such as policy wording or, less commonly, claims settlement").

■ Allendale argues that under the prevailing law in this Circuit, all parties to a contract are indispensable parties. *See, e.g., Crouse–Hinds Co. v. InterNorth, Inc.,* 634 F.2d 690, 701 (2d Cir.1980)(citing *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 110, 88 S.Ct.

733, 19 L.Ed.2d 936 (1968) and *Lomayaktewa v. Hathaway,* 520 F.2d 1324, 1325 (9th Cir.1975)("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.")). In *Squibb,* no Lloyd's underwriting syndicates were ever named as defendants. Instead Squibb named a single representative underwriter defendant, initially Haycock and later Merrett. Both sides agreed in 1984, over a dozen years before the Second Circuit raised the issue of jurisdiction, that the individual underwriters on the Lloyd's policy would be bound by a decision for or against the named representative underwriter defendant. On remand, Judge Martin focused his attention on whether defendants Haycock and Merrett satisfied diversity jurisdiction, and whether their fellow unnamed underwriters could be dismissed as indispensable parties because of their agreement to be bound.

Unlike plaintiff Squibb, Allendale sued syndicates, not individual underwriters, and the parties never stipulated that all member underwriters would be bound by a decision for or against their representative underwriter. No representative investor whose liability might bind others was ever named as a defendant. Each investor subscribed severally to different percentages of the risk. Therefore, each investor is an indispensable party by virtue of the absence of joint liability among the Lloyd's investors. Finally, Allendale objects to the notion that the Lloyd's service of suit clause could substitute for such a stipulation under these circumstances. Here, Allendale has not "instituted [suit] against

---

9. The service of suit clause states:

It is agreed that in the event of the failure of Underwriters herein to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the insured (or reinsured), will submit to the jurisdiction of any Court of competent jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed ... that *in any suit instituted against any one of them* upon this contract, Underwriters will abide by the final decision of such Court or an Appellate Court in the event of an appeal.

Defs.' Mem. in Opp'n., at 5–6 (emphasis added).

any one of [the underwriters]" as provided for in the service of suit clause. Indeed, Allendale has sued syndicates and has declined to bring suit against the individual Underwriters. Additionally, the service of suit clause only provides for suits "instituted *against*" a member underwriter by an "insured". As such, the plain language of the clause would have no effect in the realigned suit proposed by defendants in which the Underwriters would institute suit against the insured.

Defendants, however, propose to cure this defect by stipulating *now*, after litigation on the merits, to be bound by any judgment against any of the individual Names.[10] Defendant Names have proposed the following stipulation:

> For the purposes of the captioned action and such action only, any verdict or judgment entered in the action in favor of or against any London Market Insurance Company sued and appearing therein shall be binding upon and have the same force and effect as to all those Certain Underwriters at Lloyd's, London who severally subscribed, for their several shares, [to] the Reinsurance Agreement [sic].

Defendants' Sur-Reply, at 3; proposed stipulation attached as Ex. 1.[11]

In contrast to the *Squibb* stipulation, defendants here seek to force a stipulation upon plaintiff *after* the case has been fully litigated and defendants have prevailed.[12] It is one thing for defendants to agree to be bound before trial and quite another to agree to be bound after a highly favorable outcome. Finally, defendants have cited no legal precedent for their proposed stipulation. Indeed, the proposal may offend 28 U.S.C. § 1359 which prohibits collusion by any party to create subject matter jurisdiction in federal court. *See, e.g.*, 15 *Moore's Federal Practice* § 102.19[1] at 102–34 ("By enacting [§ 1359], Congress sought to assure that ordinary contract and tort litigation would not be diverted to federal courts by litigants using collusive or improper devices to create the appearance, but not the substance, of federal diversity jurisdiction."). Such an ex post facto court order binding dismissed defendants to the results of the litigation would only be tolerated by defendants where they have already won. If a review of the merits resulted in reversal and a retrial was favorable to plaintiff, it is doubtful that defendants would not raise a jurisdictional challenge on appeal.

### b. Realigning the Parties

■ Even assuming the Court agrees to assign an individual Name as a defendant and to dismiss certain Names whose presence destroys diversity, the jurisdictional problems do not end there. It is highly probable that no claim against any single name satisfies the jurisdictional amount. Indeed, the Court is not aware of any claim against a single underwriter which meets the jurisdictional amount, in comparison to *Squibb* where claims against at least 619 individual underwriters met the

---

10. It should be noted that in proposing this stipulation, defendants implicitly acknowledge the difficulty in relying on the service of suit clause as a means to bind all defendants to a judgment against any one Name. The service of suit clause is simply not the functional equivalent of either defendants' proposed stipulation or the stipulation signed by the *Squibb* parties a decade prior to trial.

11. Even were all parties to consent to the stipulation, they could not consent to jurisdiction because such an agreement would constitute a collusive joinder under § 1359. *See* 15 *Moore's Federal Practice* § 102.19[3]. Thus, defendants propose that the Court enter an

order confirming the Names' agreement to be bound by the judgment so that plaintiff would not be prejudiced by the dismissal of nondiverse defendants.

12. Moreover, defendants' proposed stipulation does not address whether defendants intend for it to be signed by a single representative or the thousands of individual underwriter members of the thirty-six syndicates. It is difficult to imagine defense counsel obtaining the consent and signature of every single defendant, whose identities remain unknown.

amount in controversy. To overcome this additional hurdle, defendants suggest that the Court realign the parties, making Allendale the defendant and naming the London Market Companies and one diverse Name underwriter in his or her individual capacity as plaintiffs. The plaintiffs would seek a declaration of their rights under the reinsurance agreement. Although no Name underwriter meets the jurisdictional amount, several of the London Market Companies do satisfy jurisdictional requirements. For example, the Excess Insurance Company is a British corporation with an amount in controversy of over $1.17 million.

However, this proposal underscores another essential difference between the instant case and *Squibb.* In *Squibb,* after sixteen years of litigation, both sides were willing to make any structural changes necessary to preserve jurisdiction. Here, however, Allendale is unwilling to dismiss any defendants or to consent to being named itself as a defendant. Defendants have cited no authority for the proposition that a court may realign parties against their will, other than in the context of a court's duty to look beyond the pleadings and rearrange the parties according to their real interest in the dispute. *See* 32A Am.Jur.2d *Federal Courts* § 896 (1995); *City of Dawson v. Columbia Ave Sav. Fund,* 197 U.S. 178, 25 S.Ct. 420, 49 L.Ed. 713 (1905).

### c. Aggregation of Claims Pursuant to § 1367

Assuming, *arguendo,* that the Court agrees to realign the parties and exercise jurisdiction over the claims by plaintiff

London Market Companies which satisfy the amount in controversy, Reinsurers then argue that the Court may retain jurisdiction, pursuant to 28 U.S.C. § 1367, over claims brought by any of the Names, which would not otherwise meet the required amount in controversy.[13] Under the Reinsurers' theory, because the claim between Allendale and the London Market Companies and Allendale's claim against the designated Underwriter (the proposed supplemental claim) are based on the same reinsurance agreement, the supplemental claim is "so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

However, defendants' proposal presumes the existence of a jurisdictional precept which neither the Supreme Court nor the Second Circuit has ever endorsed— that in enacting § 1367 Congress legislatively overrode the Supreme Court's holding in *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939). In *Clark,* the Supreme Court announced the principle that where several plaintiffs assert separate demands in a single suit, the amount involved in each claim must satisfy the jurisdictional requirement, and the plaintiffs' individual claims cannot be aggregated to satisfy the amount in controversy. Consequently, *Clark* would prevent the Court from exercising jurisdiction over the Name underwriters' claims which fail to satisfy the amount in controversy requirement. Nevertheless, Reinsurers encourage the Court to adopt the theory that § 1367 legislatively overrode *Clark* 's jurisdictional requirements.

---

**13.** Section 1367, applicable to all civil actions commenced on or after December 1, 1990, provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Section 1367 sets forth several exceptions to the Court's exercise of supplemental jurisdiction, including "claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19." *Id.* at § 1367(b).

While the plain language of § 1367 implies that supplemental jurisdiction would extend to the designated plaintiff underwriter even if his or her claims do not meet the amount in controversy, the only two Circuits to address whether § 1367 overrules *Clark* have reached opposite conclusions. The Third Circuit recently held that *Clark*'s general prohibition against aggregation of claims to meet the amount in controversy requirement survives the enactment of § 1367. *See Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 221 (3d Cir.1999) (sufficient ambiguity in § 1367 made resort to legislative history appropriate; Congress and Federal Courts Study Committee intended to prevent erosion of the diversity requirements).

The Seventh Circuit, on the other hand, concluded that § 1367 provided for supplemental jurisdiction over an action arising out of a construction project filed by two plaintiffs, only one of whom had a claim in excess of the $50,000 jurisdictional amount. *See Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928 (7th Cir. 1996) (analogizing to *In re Abbott Labs.*, 51 F.3d 524 (5th Cir.1995) (holding that clear language of § 1367 overruled *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), and permitting supplemental jurisdiction in class actions in which some claims failed to meet amount in controversy)); *see also Garza v. National Amer. Ins. Co.*, 807 F.Supp. 1256, 1258 (M.D.La.1992) (§ 1367 "amounts to legislative overruling of pre-§ 1367 cases" regarding amount in controversy requirement).

I agree with the Third Circuit that there is sufficient ambiguity in § 1367 to require an examination of its legislative history to determine the intent of the drafters. This is one of those rare situations in which "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Meritcare*, 166 F.3d at 222 (quoting *U.S. v. Sherman*, 150 F.3d 306, 313 (3rd Cir. 1998)).

Title I of the Judicial Improvements and Access to Justice Act established a Federal Courts Study Committee to study and report to Congress on a range of problems confronting the federal judiciary, particularly docket congestion. *See* Pub.L. No. 100–702, Title X, § 1019(a), Nov. 19, 1988, 102 Stat. 4671, § 15; renumbered Pub.L. 101–650, Title III, § 325(a)(1), Dec. 1, 1990, Stat. 5120. Among other recommendations, the Committee encouraged Congress to enact § 1367 of Title 28 in response to *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). In *Finley*, a plaintiff who filed a wrongful death action in the district court under the Federal Torts Claims Act sought to join a state-law claim arising out of the same factual circumstances against a new defendant. The Supreme Court held that because the added defendant was not of diverse citizenship, the federal court had no jurisdiction to hear the claim, thereby requiring the plaintiff to file separate suits in both state and federal court. *See Finley*, 490 U.S. at 547, 109 S.Ct. 2003. As a result, the Federal Courts Study Committee recommended that Congress examine the doctrine of pendent and ancillary jurisdiction and "expressly authorize federal courts to assert pendent jurisdiction over parties without an independent federal jurisdictional base." Report of the Federal Courts Study Committee ("Committee Report"), 47 (Apr. 2, 1990). The Committee also recommended that Congress substantially contract diversity jurisdiction (by, for example, raising the amount in controversy requirement) because of its expense to the federal system and the existence of alternate state court forums. *See* Committee Report, 14–15, 39–41.

In designing § 1367, Congress specifically intended to overrule *Finley*, but did not speak directly to the issue of whether § 1367 overruled *Clark* to permit the joinder of plaintiffs whose claims fail to meet the amount in controversy. Thus, the new statute left the issue of aggregating multi-

ple claims to satisfy the amount in controversy requirement in an uncertain state. *See, e.g.,* Richard D. Freer, *Toward A Principled Statutory Approach to Supplemental Jurisdiction in Diversity of Citizenship Cases,* 74 Ind. L.J. 5 (Winter 1998) (arguing that § 1367 should be revised to expressly overrule *Clark* ); Martin H. Redish, *Reassessing the Allocation of Judicial Business Between State and Federal Courts,* 78 Va. L.Rev. 1769, 1814–22 (Nov.1992) (discussing § 1367's unclear treatment of diversity-based actions). The legislative history indicates that Congress enacted § 1367 essentially to restore a pre-*Finley* understanding of supplemental jurisdiction, presumably without disturbing *Clark.* Indeed, in enacting § 1367, the House Judiciary Committee emphasized that "[i]n diversity cases, the district courts may exercise supplemental jurisdiction, *except when doing so would be inconsistent* with jurisdictional requirements of the diversity statute." H.R.Rep. No. 734, 101st Cong., 2d Sess. 28 (1990), reprinted in 1990 U.S.C.C.A.N. 6874–75 (emphasis added). Moreover, in repeatedly amending § 1332 to raise the amount in controversy limit, Congress has expressed its desire to reduce the caseload of federal courts by creating an entry bar based on a case's financial worth. *See* 15 *Moore's Federal Practice* § 102.100.

██ Given this legislative history, I am not convinced that Congress intended § 1367 to overrule *Clark* 's general prohibition against aggregation of claims to meet the amount in controversy requirement. Nor do I believe it advisable to allow such aggregation in light of the demands upon federal judicial resources already stemming from diversity actions. For these reasons, and because of the difficulties discussed above in dismissing the purportedly dispensable named underwriters and realigning the parties, I decline to adopt defendants' first proposal.

### 2. Option Two: Rule 23.2 Class Action with Aggregation

██ Defendants next suggest reconfiguring the action as a Rule 23.2 class action, using aggregation to meet the amount in controversy. Class actions are an exception to the complete diversity of citizenship rule—only the citizenship of the class representatives is relevant for establishing diversity jurisdiction. *See Snyder v. Harris,* 394 U.S. 332, 340, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). Thus, if this case were recast as a class action, only the lead underwriter's citizenship would be relevant for jurisdictional purposes. However, the Supreme Court has expressly barred the aggregation of several claims in class actions, holding that the claim against each defendant, even if seen as part of a class, would have to meet the jurisdictional amount. *See Zahn.* Accordingly, defendants' proposal would not resolve the jurisdictional issue because the claim against each underwriter would likely fall below $50,000.

#### a. Creating a Class for Defendants

Defendants suggest that the Court create a class of defendants consisting of Lloyd's Names who subscribed to the Allendale reinsurance contract. This option was briefly discussed by the Second Circuit in *Squibb,* but recommended only as a "last resort" because of the "substantial, though perhaps not insuperable difficulties" presented by the Federal Rules. *Squibb I,* 160 F.3d at 935 (declining to recast as class action, but not foreclosing district court from so doing). Reinsurers argue that the proposed class would satisfy the only pre-requisite to Rule 23.2 class treatment—"fair and adequate representation." *Curley v. Brignoli, Curley & Roberts Assoc.,* 915 F.2d 81, 85–86 (2d Cir. 1990). Rule 23.2 provides that an action "brought by or against the members of an *unincorporated association* as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will *fairly and adequately protect* the interests of the association and its members." Fed. R.Civ.P. 23.2 (emphasis added).

### i. Unincorporated Association

 Although he recast *Squibb* as a Rule 23 class action, Judge Martin declined to recast the case as a Rule 23.2 class finding that the Lloyd's defendants there did not constitute an unincorporated association. *See Squibb II,* 1999 WL 350857, at *17; *but see Advani Enterprises, Inc. v. Underwriters at Lloyd's,* 140 F.3d 157, 160 (2d Cir.1998) (finding Lloyd's underwriters and a syndicate were unincorporated associations for the purpose of Rule 23.2). Following *Advani,* I find that the defendant syndicates of which the Names are members are unincorporated associations.

### ii. Fair and Adequate Representation

The purpose underlying the requirement of fair and adequate representation is to afford the protection to absent parties which due process requires. *See Curley,* 915 F.2d at 86. Reinsurers maintain that the members of the proposed class would be fairly and adequately protected by having one Name as their representative because: (1) their potential liability derives from the same reinsurance agreement; (2) each Name is similarly situated with respect to each other (even though each Name subscribes severally and for different percentages of the risk); (3) the representative Name has a personal stake in the outcome; and (4) the representative Name has common interests with other class members and the ability and willingness to defend the interests of the class through qualified counsel. Assuming, *arguendo,* that the members of any proposed class would indeed be fairly and adequately represented, recasting this case as a class action leads, once again, to the stumbling block of the amount in controversy requirement.

### b. Aggregation to Meet the Amount in Controversy

 Neither the Supreme Court nor the Second Circuit has squarely addressed whether § 1367, enacted in 1990, super-cedes *Zahn*'s express ban on the aggregation of several claims in a single class action to meet the amount in controversy requirement. Thus, it would appear that the claim against each defendant, even if part of a Rule 23 class, must meet the jurisdictional amount requirement. *See Squibb I,* 160 F.3d at 934. In addition, the notion that aggregation would be permitted in Rule 23.2 class actions, notwithstanding *Zahn,* has not been addressed by any circuit court, and no court has ever held that aggregation is permitted. *See Squibb I,* 160 F.3d at 934. The only case in the Second Circuit to have addressed this issue is *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 92 Civ. 5249, 1998 WL 274346, at *6 (S.D.N.Y. May 26, 1998), in which Magistrate Judge Peck rejected the argument that aggregation of claims to meet the amount in controversy requirement was permitted in Rule 23.2 class actions. There, Judge Peck dismissed the case for lack of diversity jurisdiction despite *six years* of litigation in federal court.

Nevertheless, defendants recommend that the Court analogize to and follow Seventh and Fifth Circuit decisions holding that § 1367 has overruled *Zahn* in the context of *Rule 23* class actions. *See In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 607 (7th Cir. 1997) ("At least one named plaintiff must satisfy the jurisdictional minimum. If he does, the other named plaintiffs and the unnamed class members can, by virtue of [§ 1367] piggyback on that plaintiff's claim."); *In re Abbott Labs.,* 51 F.3d 524 (5th Cir.1995) (same). The Third and the Tenth Circuits, however, have upheld the continuing vitality of *Zahn* in the context of Rule 23 class actions. *See Meritcare v. St. Paul Mercury,* 166 F.3d 214 (3d Cir. 1999); *Leonhardt v. Western Sugar Co.,* 160 F.3d 631 (10th Cir.1998) (legislative history and language of statute can be read to support holding that "1367(a) and (b) can be read literally, and unambiguously, to require each plaintiff in a class action

diversity case to satisfy the *Zahn* definition of 'matter in controversy' and to individually meet the $75,000 requirement").

The legislative history of § 1367 explains that it "is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley*," H.R.Rep. No. 734, 101st Cong., 2d Sess. 28 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6875. In fact, the legislative history cites to *Zahn* as a pre-*Finley* case untouched by the Act. *Id.*, 490 U.S. at 565 n. 17, 109 S.Ct. 2003. A number of lower courts that have addressed the issue have relied on the legislative history, rather than the language of § 1367, to hold that the statute does not confer supplemental jurisdiction over the claims of Rule 23 class members that do not meet the jurisdictional minimum. For example, in *Snider v. Stimson Lumber Co.*, 914 F.Supp. 388 (E.D.Cal.1996), Judge Lawrence Karlton stated:

> [g]iven the ambiguity of the statute and the longstanding precedent against the aggregation of separate and distinct claims, resort to the legislative history is appropriate. That history demonstrates that Congress did not intend § 1367 to overrule *Zahn*. Accordingly, this court, joining the vast majority of district courts around the country, concludes that where plaintiffs base jurisdiction of a class action upon diversity and allege separate and distinct claims, they must allege that each class member has a $50,000 claim to maintain the case.

914 F.Supp. at 391; *see also Colon v. Rent–A–Center, Inc.*, 13 F.Supp.2d 553, 562 (S.D.N.Y.1998) (Judge Leonard Sand held that § 1367 "did not overrule, impliedly or otherwise, the core holding of *Zahn*," noting that contrary view "is the minority view and has not been followed in this Circuit"); *Greenberg v. Trace Int'l. Holdings, Inc.*, 99 Civ. 306, 1999 WL 587935, *3 (S.D.N.Y. Aug. 4, 1999) (Judge Sidney Stein held that class action plaintiffs' failure to meet amount in controversy

required dismissal; "courts of this district which have considered the issue have uniformly determined that § 1367 does not overrule *Zahn* ").

Defendants also recommend that the Court return to a pre–1966 amendment view of class actions which characterized classes as "true", "spurious" or "hybrid". *See Snyder v. Harris,* 394 U.S. 332, 335, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). A "true" class action was one in which the rights of the different class members were common and undivided, and aggregation was permitted in such cases. Although the 1966 amendments to Rule 23 replaced these categories with a functional approach to class actions, defendants assert that the traditional categories endure in theory. *See Brandt v. Owens–Illinois, Inc.,* 62 F.R.D. 160, 169 (S.D.N.Y.1973) ("[A]lthough these categories stand today largely as historical curiosities, they retain a certain vitality in the determination of the permissibility of aggregation."). Defendants argue that suits such as this, which involve unincorporated associations, resemble the historical category of "true" class actions, in which aggregation is appropriate. "There is some authority suggesting that '[s]ince [a Rule 23.2] suit was recognized as a true class suit under former Rule 23(a), it should follow that the common claims by or against the individual members of the unincorporated association can be aggregated to sustain jurisdictional amount requirements.' " *Squibb I,* 160 F.3d at 934–35 (citing 3B *Moore's Federal Practice* § 23.2.02 at 23.2–7 to 23.2–8 (2d ed.1985) (footnote omitted)).

However, in *Squibb,* the Second Circuit noted that "no court has ever held that aggregation is permitted in a Rule 23.2 action. And, once again, we deem it unadvisable to decide this novel question at present." *Squibb I,* 160 F.3d at 934. On remand in *Squibb,* Judge Martin agreed that the *Zahn* requirement remains in full force with regard to Rule 23 class actions

despite the enactment of § 1367.[14] I agree with Judge Martin. Accordingly, I find that Congress did not intend to overrule *Zahn* by enacting § 1367 and, consequently, I find that defendants' second proposal for constructing federal jurisdiction is not feasible.

### 3. Option Three: Maintaining Jurisdiction Over Diverse Defendants

Finally, if this action cannot be structured to preserve jurisdiction over all the parties, defendants suggest dismissing the non-diverse defendants pursuant to Rule 21 and maintaining jurisdiction over those defendants who are diverse—the London Market Companies. There are sixteen London Market Companies which collectively represent 50.74% of the subscription to the reinsurance agreement. All but one of the sixteen, Allianz International Insurance Company Limited, London ("Allianz"), meet the $50,000 amount in controversy. Defendants suggest that were Allendale the defendant, and the fifteen diverse London Market Companies the plaintiffs, the Court could exercise supplemental jurisdiction over Allianz's claim pursuant to § 1367.

### a. Dismissal of Non–Diverse Syndicate Defendants

 As discussed above, a court may dismiss a dispensable party whose presence destroys diversity. *See Newman–Green*, 490 U.S. at 832, 109 S.Ct. 2218. However, as Allendale observes, a court may only dismiss non-diverse defendants

where the jurisdictionally-defective defendants are jointly liable with the remaining defendants. *See id.* at 828–29, 109 S.Ct. 2218 (Court approved dismissal of a dispensable non-diverse party because all guarantors were jointly and severally liable so plaintiff would not be prejudiced by dismissal of one guarantor defendant); *see also Walter v. Northeastern R. Co.*, 147 U.S. 370, 373, 13 S.Ct. 348, 37 L.Ed. 206 (1893) (aggregation of claims to achieve diversity jurisdiction barred when liability of the defendants is several and not joint).[15]

Defendants concede that the Lloyd's underwriting syndicates are not jointly liable with the remaining London Market Company defendants. Rather, they are liable only for their own individual respective shares aggregating just under fifty percent of Allendale's claim. The London Market Company defendants are liable only for their respective shares aggregating just over fifty percent. Allendale argues that all thirty-six Lloyd's syndicates are parties to the reinsurance contract and, therefore, indispensable. Dropping any one defendant may deprive Allendale of the possibility of complete recovery at a later stage of the litigation if, for example, Allendale becomes entitled to a new trial after appellate review of the merits.[16] I am not persuaded by defendants' argument that Allendale will not be prejudiced or that "in equity and good conscience" the action should proceed among the parties without the defendants who destroy diver-

---

**14.** Nevertheless, Judge Martin reasoned that because the thousands of Names who may be liable to Squibb are all citizens of foreign states, they need not satisfy the jurisdictional amount. *Squibb II*, at *14–15; *see supra* note ────.

**15.** It should be noted that Rule 19 treats "joint and several" liability differently in torts and contracts. A "tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability." Fed.R.Civ.P. 19 Advisory Committee's Note. However, "an action seeking recission of a contract must be dismissed un-

less all parties to the contract, and others having a substantial interest in it, can be joined." *Acton Co., Inc. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76, 81–82 (1st Cir.1982) (citing *Crouse–Hinds*, 634 F.2d at 701).

**16.** The following scenario would prejudice Allendale: (a) the appellate court grants a new trial; (b) Allendale prevails, but recovers only 50% of its loss; (c) Allendale is forced to pursue an action for the remaining 50% of its loss in a different forum; (d) the possibility, thereafter, of conflicting decisions at either the trial or appellate level.

sity. Consequently, I find this third proposal as undesirable as the first two.

## III. Conclusion

Jurisdiction in this action cannot be saved despite the various alternatives suggested by defendants. For the reasons set forth above, this Court lacks subject matter jurisdiction over this dispute. One of the most fundamental tenets of our Constitution is that not all cases may be brought in federal court. The Clerk of the Court is directed to close this case.

SO ORDERED.